**Lora I. BILDERBACK, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Charles N. BILDERBACK, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. Nos. 79–1221, 79–1222.

United States District Court, D. Oregon.

Oct. 22, 1982.

Richard E. Kingsley, Lebanon, Or., for plaintiffs.

Sidney I. Lezak, Portland, Or., for defendant.

## OPINION

JAMES M. BURNS, Chief Judge:

### A. *Introduction*

As dusk turned to dark October 14, 1977, Rocky, a frisky but otherwise undistinguished Forest Service pack horse, trotted eastward in the westbound lane of Highway 20, where he encountered two westbound motor vehicles. The first, a truck, fortunately for its driver (and for Rocky) swerved and avoided contact. The second vehicle carried plaintiffs, Mr. and Mrs. Bilderback, returning from an outing in the forest nearby. Unfortunately for the Bilderbacks (and for Rocky), a head-on collision occurred, resulting in:

1) Injuries to the Bilderbacks

2) Damage to their car

3) Death to Rocky

4) This lawsuit

Rocky's legacy has spawned vexing questions of open range law and federal preemption of state grazing law, the solution to which may well have far-reaching results. It is ironic that an otherwise routine car-horse collision could produce such knotty legal problems. For the reasons that follow, I conclude that Rocky's roam was wrongful; that the Willamette National Forest is not open range under Oregon's liberal open range law, where animals may run at large; that under the circumstances here, Rocky's presence on the highway was

the product of negligence on the part of his master—a government employee—and thus that plaintiffs have established governmental liability under the Tort Claims Act.

## I. *Open Range Issue*

The government contends that under Oregon law the Willamette National Forest is open range land where livestock may lawfully roam at large. Relying on *Kendall v. Curl,* 222 Or. 329, 353 P.2d 227 (1960), (and ORS Ch. 607), the government argues that it had no duty to keep its horses and mules off the highway. Hence, it concludes that it cannot be held liable for allowing Rocky and his equine compatriots to run on Highway 20.

The question presented here is initially one of state legislative jurisdiction or application. The government is arguing for the application of state law to federal land. Whether such an application is appropriate or not depends, in the first instance, on the type of federal property involved.

█ Under the Constitution, two provisions relate to federal property. The first is the so-called "jurisdiction" clause.

The Congress shall have power . . .

. . . .

To exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may, by cession of particular states, and the acceptance of Congress become the seat of government of the United States, and to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings. . . . Art. I, Sec. 8, Cl. 17.

Under this provision, the state loses all legislative power over the property in question, except such authority as it explicitly reserves to itself in ceding jurisdiction. *Paul v. United States,* 371 U.S. 245, 263–69, 83 S.Ct. 426, 437–40, 9 L.Ed.2d 292; *Fort*

*Leavenworth R. Co. v. Lowe,* 114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264 (1885). For the federal government to acquire exclusive jurisdiction over land within a state, it is necessary to have both consent of the state and acceptance by Congress. *Paul, supra; Fort Leavenworth R. Co., supra.* Once these requirements are met, however, exclusive federal enclaves may be created for purposes other than those enumerated in the jurisdiction clause. *Collins v. Yosemite Park & Curry Co.,* 304 U.S. 518, 527–30, 58 S.Ct. 1009, 1013–15, 82 L.Ed. 1502 (1938).

█ The other constitutional provision regarding federal land is the more familiar "property" clause.

The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or the property belonging to the United States . . . . . Art. IV, Sec. 3, Cl. 2.

While the furthest reach of congressional power under the property clause has not yet been resolved, the Supreme Court has observed that congressional power over public lands is "without limitations." *Kleppe v. New Mexico,* 426 U.S. 529, 539, 96 S.Ct. 2285, 2291, 49 L.Ed.2d 34 (1976). Where the federal government does not have exclusive jurisdiction over a particular area of federal land, the state is free to enforce its civil and criminal laws on those lands. But where Congress acts under the property clause providing rules and regulations for the public land, any state law which conflicts with the federal law must recede. *Kleppe,* 426 U.S. at 543–45, 96 S.Ct. at 2293–94. As in other areas of the law, federal law overrides inconsistent state law under the Supremacy Clause, Art. VI, Cl. 2.

█ In this case, it appears that the Willamette National Forest is not an exclusive federal enclave. It is not clear whether the state of Oregon ceded jurisdiction.[1] It is certain, however, that Congress did not accept, or has since renounced, exclusive jurisdiction over the forest. The provisions of

---

1. Most likely, the Willamette National Forest was created by executive proclamation and officially authorized later by Congress in the Organic Act of 1897. I believe that this is manner in which most national forests in the West were established. *See United States v. New Mexico,* 438 U.S. 696, 705–06, 98 S.Ct. 3012, 3017, 57 L.Ed.2d 1052 (1978).

Title 16 U.S.C. § 480 provide that the states retain civil and criminal jurisdiction over the national forests. The Supreme Court has interpreted this statute to mean that the states have legislative jurisdiction over the national forests. *Wilson v. Cook,* 327 U.S. 474, 486–87, 66 S.Ct. 663, 669–70, 90 L.Ed. 793 (1945). Thus, Oregon open range law would apply to the Willamette National Forest unless it conflicts, in the supremacy clause sense, with some federal law governing the forest under the property clause.

I conclude there is federal law which applies, and which overrides Oregon open range law. Congress has vested in the Secretary of Agriculture the sole authority to control grazing in the national forests. Under the Multiple-Use Sustained-Yield Act of 1960, 16 U.S.C. § 528, Congress declared that the national forests are established and shall be administered for, among other things, range purposes. Section 1 of the Organic Act of 1897, 16 U.S.C. § 551, vested the Secretary of Agriculture with the authority to "make such rules and regulations . . . as will insure the objects of such [forest] reservations." In addition, 16 U.S.C. § 580*l* provides that "in regulating grazing on the national forests" the Secretary is authorized to issue permits for grazing of livestock "under such terms and conditions as he may deem proper." *See also* 7 U.S.C. § 1011; 43 U.S.C. §§ 1751, 1752. These laws leave little apparent room for the operation of state grazing law in national forest areas.

Moreover, the Secretary has exercised his authority under these statutes and promulgated regulations governing grazing in the national forests. In part, these regulations provide:

222.1 Authority and Definitions.

(a) *Authority.* The Chief, Forest Service, shall develop, administer and protect the range resources and permit and regulate the grazing use of all kinds and classes of livestock on all National Forest System lands. . . .

222.2 Management and range environment.

(a) Allotments will be designated on the National Forest System and on other lands under Forest Service control where the land is available for grazing.

. . . .

222.3 Issuance of grazing and livestock use permits.

(a) Unless otherwise specified by the Chief, Forest Service, all grazing and livestock use on National Forest System lands and on other lands under Forest Service control must be authorized by a grazing or livestock use permit.

36 C.F.R. §§ 222.1–222.3 (1980). In implementing these regulations in the Willamette National Forest, the Forest Service has established two areas as grazing allotments. (Def's Answers to Interrog.) The conditions made a part of the grazing permit prohibit grazing outside the designated allotment. *Id.,* Ex. A.

The Secretary has also promulgated regulations prohibiting certain acts regarding livestock on the national forest lands:

261.7 Livestock

The following are prohibited:

(a) Placing or allowing unauthorized livestock to enter or be in the National Forest System or other lands under Forest Service control.

(b) Not removing unauthorized livestock from the National Forest System or other lands under Forest Service control when requested by a forest officer.

(c) Failing to reclose any gate or other entry.

36 C.F.R. § 261.7 (1980).

In my view, these laws and regulations are inconsistent with the Oregon open range law. The Oregon grazing law permits livestock to roam freely and graze at will in any area not designated as a livestock district. ORS Ch. 607. *See also Kendall v. Curl, supra.* Under the federal laws and regulations quoted above, this is clearly not permitted in the national forest lands. Grazing within the forests is strictly controlled, and unauthorized livestock are absolutely forbidden. The state open range law must therefore recede.

The government contends there is no indication that the allotment grazing system was intended to remove the national forests from the open range. It asserts that the range allotment system was created to serve entirely different purposes than Oregon's livestock districts. Its argument appears to be that since the allotment grazing system was developed for multiple use purposes, this somehow prevents it from overriding state open range law.

This argument lacks merit. Regardless of intent[2] or the purposes underlying the federal and state laws, it is certain that the state law seems to permit what the federal law prohibits. Under the property and supremacy clauses, the federal law must prevail.[3]

Support for this view is found in a series of cases involving unauthorized livestock grazing on national forest land. In these cases the government sought an injunction against the owners of livestock who turned their animals loose on open land and allowed them (intentionally or otherwise) to roam on to Forest Service land. In defense of the suits the stock owners argued that the government's failure to comply with state fence and open range laws barred the relief requested. Without exception, courts have rejected this argument and held that the state grazing laws had no application to the national forests. *Shannon v. United States*, 160 F. 870 (9th Cir.1908) (Montana fence laws not applicable to forest reserve); *United States v. Holman*, 247 F.Supp. 920 (E.D.Mo.1965) (creation of Mark Twain National Forest closed land to grazing despite Missouri open range and fence laws); *United States v. Thompson*, 41 F.Supp. 13 (E.D. Wash.1941) (Washington open range and

fence laws inapplicable to Wenatchee National Forest); *United States v. Johnston*, 38 F.Supp. 4 (S.D.W.Va.1941) (West Virginia fence laws not applicable to Monongahela National Forest); *United States v. Gurley*, 279 F. 874 (N.D.Ga.1922) (Georgia fence laws not applicable to forest reserves).

If the cattlemen of Linn County were allowing their stock to roam and graze at will in the Willamette National Forest, a knowledgeable person (who was also a bettor) would wager little money on the notion the government would not be in this (or some other) court seeking an injunction, or damages, or criminal sanctions, and arguing that the national forest is not open range. I hold that Willamette National Forest (at least the portion involved here) is not open range.

II. *The Federal Tort Claims Act and the Question of Duty*

In pertinent part, 28 U.S.C. § 1346(b), the jurisdictional provision of the Federal Tort Claims Act (FTCA), provides that district courts have jurisdiction of civil actions on claims against the United States

for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

In addition, 28 U.S.C. § 2674 provides:

The United States shall be liable, respecting the provisions of this title relat-

**2.** The federal law governing grazing in the national forests is so pervasive and detailed that it seems possible Congress did intend to displace state authority when it vested grazing authority in the Secretary of Agriculture.

**3.** The government's argument regarding the purposes behind the federal and state laws seems to be that since the federal law was to protect the resources of the forest, it should not be read as the source of a duty to motorists. The government asserts that the Oregon livestock district law differs in that it was designed to protect adjacent landowners and motorists.

The government is incorrect. The Oregon livestock district law was intended to prevent animals from running at large. ORS 607.045. The Oregon courts have read into the law a protection for motorists. *See Parker v. Reter*, 234 Or. 544, 383 P.2d 93 (1963). The federal law effectively prohibits animals running at large also. Whether it is a source of a duty to motorists is a separate question from whether it conflicts with state open range law. If a conflict is present, the fact that the law was intended to protect the forest rather than adjacent landowners would not nullify the conflict.

ing to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

28 U.S.C. § 2674. The government contends that under these provisions federal preemption of Oregon's open range law is irrelevant. The appropriate inquiry, it says, is whether state law would impose a liability on the United States. The government also points out that under FTCA the courts have refused to impose a tort duty on the government where the duty stems solely from federal law.

It is true that the courts have generally said that the United States' liability under the FTCA is governed by state law. *See Gard v. United States,* 594 F.2d 1230 (9th Cir.1979). This general language does not mean, however, that federal law may not be relied on in an FTCA suit. In *Hess v. United States,* 361 U.S. 314, 80 S.Ct. 341, 4 L.Ed.2d 305 (1960), for example, the Supreme Court was concerned with a fact situation where a workman employed by an independent contractor drowned in the Columbia River while making repairs to the Bonneville Dam. In determining the applicable source of law in the resulting FTCA suit (which was filed in this district), the Court quoted from 28 U.S.C. § 1346(b) and said:

> [The workman's] death and the wrongful act or omission which allegedly caused it occurred within the State of Oregon, and liability must therefore be determined in accordance with the law of that place. Since the death occurred on navigable waters, the controversy is, as the trial court correctly held, within the reach of admiralty jurisdiction.... Oregon would be required, therefore, to look to maritime law in deciding [the suit].

361 U.S. at 318, 80 S.Ct. at 345 (citations omitted). In a footnote the Court elaborated further:

> [7] The petitioner argues that "the place where the act or omission occurred" was on the dam itself, an extension of land, and that, therefore, this case should be decided in accordance with the law that Oregon would apply to torts occurring on land. It is clear, however, that the term "place" in the Federal Tort Claims Act means the political entity, in this case Oregon, whose laws shall govern the action against the United States "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. There can be no question but that Oregon would be required to apply maritime law if this were an action between private parties, since a tort action for injury or death upon navigable waters is within the exclusive reach of maritime law.

361 U.S. at 318 n. 7, 80 S.Ct. at 345 n. 7.

■  Maritime law is, of course, federal law. Thus, *Hess* demonstrates that federal law may provide the rule of decision in an FTCA suit when the state court in the state where the act or omission occurred would apply federal law in a like action between private parties. The FTCA does not require that *only* state law be applied when federal law would otherwise preempt. *See Southern Pacific Transportation Co. v. United States,* 462 F.Supp. 1193, 1212–16 (E.D.Calif.1978) (federal common law preempting state law may be applied in FTCA suit).

If this action were a suit between private parties, where a stock owner had negligently allowed his animals on the road in the national forest, the Oregon state court would be bound to find that federal law governing the national forest displaces state open range law. No different result should occur in this case. Just as the FTCA in *Hess* did not change the law governing the Columbia River, the FTCA here would not change the law governing the Willamette National Forest.

The cases cited by the government for the proposition that federal preemption law will not be used to impose a federal duty in FTCA suits are distinguishable. In those cases, and others in that line of authority, the courts refused to impose a tort liability on the government where the duty sought to be imposed stemmed solely from [feder-

al] statutes or regulations applicable only to federal agencies, and there was no analogous liability under state tort law. Thus, in *Devlin Lumber & Supply Corp. v. United States,* 488 F.2d 88 (4th Cir.1973), the Fourth Circuit held that since a violation of the Miller Act "can have no counterpart in private activity, and cannot give rise to liability under the common law ... a violation of the Miller Act does not create liability on the part of the government under the [FTCA]." 488 F.2d at 89. Similarly, in *United Scottish Ins. Co. v. United States,* 614 F.2d 188 (9th Cir.1979) the Ninth Circuit held that FAA regulations requiring aircraft inspections by government agents did not give rise to a tort duty (and hence liability for negligent inspection) since the simple failure to inspect another's machinery, or the failure to do so with due care, is not a common-law tort. The court held that liability could be imposed only if the state had an applicable "good samaritan" rule, making one who gratuitously undertakes a duty liable for failure to exercise due care in performing it. *See also Zabala Clemente v. United States,* 567 F.2d 1140 (1st Cir.1977) (FAA aircraft inspection case); *Davis v. United States,* 395 F.Supp. 793, 795 (D.Neb.1975), *aff'd per curiam,* 536 F.2d 758 (8th Cir.1976) (negligent OSHA inspection, no tort duty on government stems from OSHA where Nebraska places no similar duties on private persons and OSHA duties do not devolve on private persons).

■ In this case, unlike those cited above, there is an analogous tort under state law. A stock owner who negligently allows his animals to wander at large where it is unlawful for them to do so is liable under Oregon law for any damages caused. *See Parker v. Reter,* 234 Or. 544, 383 P.2d 93 (1963); *Watzig v. Tobin,* 50 Or.App. 539, 623 P.2d 1121 (1981). The applicable Oregon statute provides simply that it is unlawful to "permit [an] animal to run at large or to go upon the land of another in a livestock district in which it is unlawful for such a class of livestock to be permitted to run at large." ORS 607.045(1). This law says nothing about negligence or highways, but the Oregon courts have read into the law a proscription against permitting livestock to run upon the highways, and a provision that a stock owner will be liable only if he is negligent in permitting the animal to run at large. *Parker, supra; Watzig, supra.* It is reasonable to analogize the state statute and the federal provisions (which effectively prohibit running at large) and find similar rules applicable under the federal law.

■ Furthermore, to the extent that the duty in this case stems from federal law, it devolves not only upon the federal government but also on private parties. Federal preemption of state open range law would mean that private parties who negligently permit their stock to go upon highways in the national forest would be liable for damage caused, just as the government would be liable in its capacity as stock owner. Unlike OSHA, or the Miller Act, or FAA inspection regulations, the federal duty is imposed on private party and government alike. The Oregon courts would be bound to follow federal law in imposing liability on a private party for allowing stock to roam on the forest highways. Thus, there is not only an analogous state duty, but, in effect, an identical one.

Finally, it is not strictly necessary to find in this case that the federal grazing regulations impose a duty on the government. The federal grazing provisions need only be interpreted as voiding the application of the Oregon open range law; it need not be the source of the tort duty. The common law could be used to fill the gap. As the Oregon court recognized in *Kendall v. Curl,* 222 Or. 329, 336, 353 P.2d 227 (1960), the decided common law trend is to impose a duty of reasonable care on the owners of livestock. *See Galeppi Bros. v. Bartlett,* 120 F.2d 208, 210 (9th Cir.1941); Annot., 59 ALR2d 1328 (1958 & Supp.). The Court indicated that if it were not for the open range statute it might adopt the modern common law view. *Kendall, supra.* Applying the federal law to simply avoid application of the state stat-

ute would leave room for the common law rule to come into effect.[4]

The FTCA does not require that the Oregon open range law be applied despite its conflict with federal grazing regulations.

### III. *Negligence*

On the basis of the pretrial order and the depositions and exhibits submitted to the court, it appears that the accident in this case occurred as follows:

Lloyd Dale Van Sickle, the Forest Service packer, was at his summer base of operations at the Fish Lake Guard Station in the Willamette National Forest. The Fish Lake station is located inside an area of land which is enclosed by roads on all sides. The roads form a rough, inverted triangle with Fish Lake inside and off to one side. Highway 20 forms the top of the triangle, running in a general east-west direction. Highway 126 forms the east side of the triangle, running generally north-south. The third road, not named in the depositions or exhibits, connects highways 20 and 126 diagonally. Fish Lake Station is located just off highway 126, about a mile south of highway 20. There is a trail and a dirt road leading from Fish Lake to highway 20.

As the Forest Service packer, Van Sickle was responsible for caring for the horses and mules used by the government to maintain the nearby wilderness and roadless areas of the forest. He would take them into the back country, carrying supplies for whatever work was being done. At the time of the accident, he usually only made day trips into the forest, returning with the animals to the Fish Lake Station at night.

On October 14, 1977, Van Sickle was transferring some animals from the pasture to the corral at Fish Lake. He had a pack trip out early the next morning, and, as was apparently his custom, he put those animals to be used the next day into the corral on the night before. The testimony given at Van Sickle's deposition is not precisely clear on this point, but it appears that the pasture is a fenced enclosure and the animals are taken in and out through a gate. (Depo. at 15.) When Van Sickle testified that by leading a horse he was able to get the mules that he wanted to follow him through the pasture gate. At the same time, however, he was also followed by two other horses and another mule. In Van Sickle's words, the extra animals "scooted through before I could shut the gate." (Depo. at 15.) Van Sickle proceeded with his mule string to the corral, but the renegade horses and mule stopped on some grass near a barn by the corral. At this point, "one of the guys that was up there by that little cabin" walked on the scene. The identity of this guy was never revealed, but Van Sickle also referred to him as "help." (Depo. at 16). It is not clear, however, that this person was a government employee. The presence of this "guy" apparently caused the horses and mule to go off in another direction.

At the time the animals left Fish Lake Station it was dusk. They started out on the trail which lead from Fish Lake to highway 20. Their destination was apparently the Lava Lake pasture located on the far side of the highway. For them to reach Lava Lake, they would have to have followed the trail to highway 20, then turned east on the highway and followed it for a short distance, and then taken another trail on the far side of the road leading to Lava Lake.

---

4. An Oregon court might reach the same result by a similar route. The definition of open range in the Oregon statutes is "an area wherein livestock may lawfully be permitted to run at large." ORS 607.005(7). The Forest Service regulations would make it "unlawful" to allow livestock to run at large. Thus, the open range law interpreted in *Kendall v. Curl* would be inapplicable. However, the statute which is the source of a duty of due care in livestock districts, ORS 607.045, would also be inapplicable. The Oregon court would have to fall back on the common law to fill in the gap and determine if a duty is owed. In livestock trespass cases, the Oregon Supreme Court has said that when a grazing statute does not change the common law, it remains in effect. *French v. Cresswell,* 13 Or. 418, 422, 11 P. 62 (1886); *Strickland v. Geide,* 31 Or. 373, 378, 49 P. 982 (1897); *Pacific Livestock Co. v. Murray,* 45 Or. 103, 107, 76 P. 1079 (1904). There being no statute applicable under the above interpretations, the common law would have to be relied on.

Van Sickle's testimony indicates that he knew immediately that Lava Lake was where the animals were headed. He jumped into his pickup truck and drove along the dirt road to a point where he thought he could head off the animals as they came up the trail. When he arrived, however, the animals had already passed that point. He drove on to highway 20 to head them off there. He did not have anyone with him to assist him in recapturing the trio. It is not clear whether he had a rope or halter with him. Van Sickle testified that he might have had a halter but he could not remember. He said he planned to grab the lead horse, Rocky, by the forelock, anticipating that the others would then follow. (Depo. at 36).

When Van Sickle arrived at highway 20 he pulled off the road into a clearing near where he thought the animals would come out of the woods. Once outside, however, he realized from the sound of the trotting animals that they were coming out at a different place than he had thought. He ran to where the horses were emerging, but when he arrived Rocky had already gone past. (Depo. at 25). Standing approximately 20 feet from the highway, he tried to stop the other horse and the mule. However, both turned to the side and ran past him. Van Sickle testified that his attempt to catch the second horse and mule "kind of spooked" the animals so that they speeded up to catch Rocky. (Depo. at 37, 40).

It was dark when the animals turned east on to the highway. The second horse and mule crossed the road and went along the shoulder toward the Lava Lake trail. Rocky trotted east down the westbound lane of highway 20. Van Sickle saw lights of an approaching vehicle. He was wearing some type of hat with a light on it and he attempted to signal the driver with the light. The vehicle turned out to be a truck; it slowed down, switched on its bright

lights, swerved around the animals and continued down the highway.

The next westbound vehicle was the Bilderbacks. Mrs. Bilderback was driving the car approximately 40 miles an hour with the lights on low beam. The car collided with Rocky head on. The horse was thrown over the top of the vehicle, crushing the roof of the car and killing Rocky. The Bilderbacks sustained injuries in the collision, and the automobile was severely damaged.

For the Bilderbacks to recover under a theory of negligence, they must establish all the elements of negligence. Under Oregon law, these elements are duty, breach, causation and damages. *See Brennen v. City of Eugene,* 285 Or. 401, 405, 591 P.2d 719 (1979); *McEvoy v. Helickson,* 277 Or. 781, 786, 562 P.2d 540 (1977).

The element of duty has been generally discussed above. As a stock owner, the government owed a duty of ordinary care in the control of its animals. *See Galeppi Bros. v. Bartlett,* 120 F.2d 208, 210 (9th Cir.1941) (applying California law). This duty was owed to the Bilderbacks if they were foreseeable plaintiffs; that is, if they were within the general class of persons threatened by the defendant's conduct. *Brennen,* 285 Or. at 406, 591 P.2d 719; *Yanzick v. Tawney,* 44 Or.App. 59, 65, 605 P.2d 297 (1980). The scope of the duty owed is also governed by foreseeability. A defendant whose act injures another will be held liable only if the injury was a reasonably foreseeable consequence of the act. *Brennen, supra; Yanzick, supra.*[5]

Here, both the plaintiffs and the injury suffered were foreseeable. A reasonable person should anticipate that if he fails to exercise ordinary care in controlling, confining and recapturing horses and mules, they may go on to nearby highways and be an unreasonable risk of injury to motorists.

**5.** It is not precisely clear where foreseeability fits in the Oregon scheme of negligence law. It is clear that there are two aspects to foreseeability: one relating to foreseeable plaintiffs and the other to foreseeable harm. Whether one or both these aspects fit under duty, or some other category, is not certain. I place it under duty because the most recent cases refer to it under that category. *Brennen v. City of Eugene, supra; Christensen v. Epley,* 287 Or. 539, 556–557, 601 P.2d 1216 (1979) (Tongue, J. concurring).

Foreseeability is especially strong here since the Fish Lake Station was completely enclosed by roads, and trails lead directly to nearby highway 20.

As to the breach element, the Bilderbacks assert that the government was negligent and breached its duty of ordinary care in one or more of the following ways:

1. In not confining the animals adequately at the Fish Lake Station.

2. In permitting the animals to escape from the control of Van Sickle.

3. Van Sickle failed to exercise reasonable care in the control or recapturing of the animals and therefore negligently failed to prevent harm.

4. Van Sickle failed to take additional help, halters or rope in order to recapture the animals and attempted to do so by himself, by catching one horse by the mane.

While drafting of these allegations leaves something to be desired, I think they charge basically three things: failure to adequately confine, failure to use care to prevent escape, and failure to use care to recapture. There is no evidence on the adequacy of the animal's confinement. The fences at Fish Lake have not shown to have been insufficient; it was the transfer from one enclosure to another which allowed the animals to escape.

I think there are sufficient facts shown to prove negligence (or breach) in failing to use reasonable care to control the animals so as to prevent escape. While a more complete and detailed factual record would be helpful, I think the record shows that Van Sickle was negligent in leaving the gate open so that the animals could get loose. As the finder of fact, I conclude that a reasonably prudent person exercising ordinary care would not leave the pasture gate open so that three animals, not just one quick one, could "scoot through." The inference is that Van Sickle's chosen means of transferring the stock to the corral was not a reasonable one; or, that in using this method Van Sickle was not paying particular close attention. Van Sickle's conduct seems especially unreasonable where addi-

tional help was available to shuttle the animals to the corral, or to shut the gate behind Van Sickle so that the other animals would not slip out. I recognize that negligence might be better shown through more detailed testimony on how the animals escaped. Some expert testimony on how stock should be handled might have been helpful. Nonetheless, I think that the minimum showing of negligence has been made. A reasonable person would realize that in the exercise of ordinary care a pasture gate should not be left open so that three animals could get loose. *See* Annot., 59 ALR2d 1328, § 9 (1958 & Supp.) (collecting "open gate" cases).

There is also sufficient showing of negligence in failing to use reasonable care to recapture the stock. Although it is not certain that Van Sickle did not have ropes or a halter, he did not take additional help when it was available. Where another "guy" is at hand, a reasonable person exercising ordinary care would not attempt to recapture two horses and a mule by himself.

Regarding the element of causation, I believe Van Sickle's negligence in allowing the animals to escape was a sufficient cause of the plaintiffs' injuries. For legal causation to exist under Oregon law, the act of the defendant must be a "substantial factor" in bringing about the injury to the plaintiff. *Brennen v. City of Eugene,* 285 Or. at 413, 591 P.2d 719; *Sworden v. Gross,* 243 Or. 83, 409 P.2d 897 (1966). The Oregon courts have rejected the notion of "proximate cause;" it need only be shown that the defendant's conduct was a cause in fact. *See Christensen v. Epley,* 287 Or. 539, 570–71, 601 P.2d 1216 (1979) (Tongue, J. concurring); *Simpson v. Sisters of Charity,* 284 Or. 547, 555, 588 P.2d 4 (1978). Certainly, Van Sickle's negligence in allowing the animals to get loose was a cause in fact of the plaintiffs' injuries. The other "guy's" act in walking toward the animals and thereby causing them to move away would not prevent Van Sickle's prior negligence from being a "substantial factor" in bringing about the injuries. *See Simpson, supra; Sworden, supra.*

Van Sickle's negligence in failing to use due care in recapturing the animals would not, however, be a legal cause of the Bilderbacks' injuries. If Van Sickle breached his duty of due care only by failing to take available assistance, this failure would not be a substantial factor as to the injuries. By the time Van Sickle arrived at highway 20 to recapture the animals, Rocky, who caused the collision, had already passed. There is no indication that if an assistant were used the animals could have been headed off sooner. Indeed, the time it took to obtain assistance might have meant that all the animals would be on the highway by the time Van Sickle and company arrived.

It is apparently plaintiffs' contention that Van Sickle's attempted recapture actually worsened the situation by driving the animals out on to the road and causing them to speed up. But, the evidence does not support this contention. The animals were already headed for the road, and Rocky was already on the road without the benefit of Van Sickle's negligent guidance. And, only the other two animals speeded up, there is nothing indicating that Rocky accelerated because of the attempted recapture. The failed recapture was not a cause in fact or a "substantial factor" in bringing about the plaintiffs' injuries.

The final element is damages. This element is unquestionably satisfied.

IV. Conclusion

The Willamette National Forest is not open range. The FTCA does not require that it be treated as such under state law where federal law preempts state grazing law. The government owed the plaintiffs a duty of ordinary care in the care and control of its livestock. While the evidence might be stronger, there is sufficient evidence that the government employee breached this duty in allowing two horses and a mule to slip out of the pasture through an open gate. This negligence was a substantial factor in bringing about the plaintiffs' injuries. The Bilderbacks are entitled to recover against the government for those injuries.

I award damages as follows:

A. Damage to vehicle—$2,767.49
B. Mr. Bilderback—$506.32, lost wages, medical expenses of $113.50, and general damages of $2,000.00, for a total of $2,619.82
C. Mrs. Bilderback—$795.50, lost wages, medical expenses of $2,095.50, and general damages of $15,000.00, for a total of $17,891.00.

The Clerk will enter judgment accordingly.

The foregoing constitute findings and conclusions, Rule 52, Fed.R.Civ.P.